# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION AT KNOXVILLE

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 3:06-CV-11 Phillips/Guyton |
| CMC CONSTRUCTION COMPANY, INC., JERRY G. CROWE, TARA ASHER, GARRETT ASHER, RONALD ASHER, and ASHER INVESTMENTS LIMITED PARTNERSHIP, | ) ) ) ) ) ) | 12-PERSON JURY DEMANDED |
| Defendants. | ) | |

## DEFENDANTS' NOTICE OF FILING PORTIONS OF THE RECORD

Defendants Tara Asher, Garrett Asher, Ronald Asher, and Asher Investments Limited Partnership, by and through counsel, respectfully hereby provides notice of the filing of portions of discovery depositions to supplement the record in support of their responses to Plaintiff Hartford Fire Insurance Company's motions for partial summary judgment as to the contractual indemnity claims and fraudulent conveyance claims. Notice is given that the following documents are filed contemporaneously herewith as attachments:

1. From the Deposition of Tara Asher, taken May 21, 2009: pages 33-35; pages 96-98; and, pages 186-188.

2. From the Deposition of Laura Mahler, taken May 20, 2009, page 43, page 49, Exhibit 10 and Exhibit 12.

Respectfully submitted,

/s/ W. Clark Meredith         .
W. CLARK MEREDITH, BPR # 001523
Joyce, Meredith, Flitcroft and Normand
Attorneys for Defendants Tara Asher,
Garrett Asher, Ronald K. Asher and Asher
Investments Limited Partnership
P. O. Box 6197
Oak Ridge, Tennessee 37831-3814
(865) 482-2486

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been

served upon all parties at interest by placing the same in the United States Mail, first class

postage prepaid, addressed to their counsel of record as follows:

Fred C. Statum, III, Esquire                  Billy P. Sams, Esquire
Manier & Herod                            122-A Jefferson Court
Suite 2200, One Nashville Place            Oak Ridge, Tennessee 37830
150 Fourth Avenue North
Nashville, Tennessee 37219

This 27th day of October, 2009.

/s/ W. Clark Meredith           .

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TENNESSEE
2            NORTHERN DIVISION AT KNOXVILLE

3

HARTFORD FIRE INSURANCE        )
4  COMPANY,                        )
                                 )
5                                  )
                Plaintiff,        )
6                                  )
                                 )
7                                  )
v.                               )    No. 3:06-CV-11
8                                  )
                                 )
9  CMC CONSTRUCTION COMPANY,       )
   INC., JERRY G. CROWE, TARA      )
10  ASHER, GARRETT ASHER, and       )
   RONALD K. ASHER,               )
11                                  )
                                 )
12              Defendants.        )

13

14      * * * * * * * * * * * * * * *

15

16           DEPOSITION OF TARA ASHER

17

18           Thursday, May 21st, 2009

19

====================================================
20               TRUESDEL & RUSK
        Registered Professional Reporters
21
        Ginger Truesdel, RPR, RDR, CRR
22         Certified Realtime Reporter
           7047 Duncan's Glen Drive
23         Knoxville, Tennessee  37919
              (865) 450-9772
24
           www.truesdelrusk.com          COPY
25         gingertrue@comcast.net


1   approximately two months after that meeting?

2          Q        If that's your recollection, you

3   can absolutely --

4          A        I'm sorry, I'm --

5          Q        -- you can absolutely say that.   I

6   want your best recollection, okay?

7          A        It was a couple of months after the

8   meeting.

9          Q        And why did she call you?

10         A        She was looking for Jerry Crowe,

11  could not find him and was not getting returned

12  telephone calls from him.  And she said that she

13  needed Jerry Crowe to sign a document, and --

14         Q        Did she tell you what document that

15  was?

16         A        She did, and I interpreted it was a

17  document to have Jerry authorize her contract with

18  another contractor to finish jobs, was my

19  understanding.

20         Q        Did you ever see the document that

21  she was --

22         A        No.

23         Q        -- talking about?   Okay.

24                  And what did you -- what did you

25  say to Ms. Mahler during the course of that

1   conversation?

2         A        I said to Ms. Mahler, I said, "Do

3   you realize who this contractor is you're talking

4   to?"  And she was very quiet and she said no --

5   well, she said, "It's Anthony Gordon Construction

6   Company."  And I said, "Do you know who that is?"

7   And she was quiet, and I said, "That's Jerry Crowe's

8   brother."  And she was very quiet.

9                  And I at that point in time, I

10  believe I told her that we were going through a

11  divorce, I was not being kept informed -- informed

12  as to the status of CMC and Hartford's relationship,

13  and I asked her to please keep me informed on what's

14  going on, and she said, "I will do that."

15                 After that conversation, there

16  was -- I had attempted to call her --

17        Q        Let's stop before we move on to the

18  next one.

19        A        Okay.

20        Q        And just so I have your best

21  recollection, do you recall anything else being

22  discussed with --

23        A        No.

24        Q        -- Laura Mahler during the

25  course --

1          gathering the facts, discovery --

2          Q          At this time today as we sit here,

3    that's just your personal belief?

4          A          Yes.

5          Q          What else, if anything, do you

6    contend that Hartford did wrong?

7          A          Hartford's trying to come back and

8    get however much money it was, $3,000,000, when the

9    Indemnity Agreement reflected a maximum of 250,000

10   per household.

11         Q          Which Indemnity Agreement did?  It

12   might be Exhibit 2.

13         A          Yeah.

14         Q          Okay.  And that was the 1996

15   Indemnity Agreement?

16         A          I believe that's the one.

17         Q          And I'm not going to beat this dead

18   horse, you know, it's probably a legal issue, but we

19   discussed and you agreed that the 2002 Indemnity

20   Agreement doesn't mention the addendum or a $250,000

21   limit?

22         A          It does not mention that.  It does

23   not refute that, and Jerry Crowe, when he asked me

24   to sign it, said we could lose our house, this is

25   still the $250,000 limit.

Q        And that's what Jerry Crowe said?

A        Yes.

Q        All right.  So the second thing that Hartford did wrong was to sue for more than $250,000?

A        Yes.

Q        Is it your position that Hartford did anything else wrong?

A        At this point in time, no, because like Clark says, I have not had access to, which could be another thing they did wrong, I've had no access to records or accounting records up until what we've found in files recently, but there's still no account information out there.

Q        And who's got the accounting information?

A        I can only assume Hartford does or one of the attorneys involved.

Q        What kind of --

A        Expenditures, what the job contracts ended up being, what they collected on them, what they expended in your fees, and Mr. Little's fees, and Ms. Laura's expenses.

There's no accounting records out there.  It's just like they pulled this number out

1    of the air and expect somebody to pay it.

2             Q        Ms. Asher, you did come to my

3    office and look at some boxes of documents.

4             A        Yes.

5             Q        How many boxes of documents did you

6    look through?

7             A        Me personally?

8             Q        Yes.  You and the folks that came.

9             A        Six to nine boxes.

10            Q        Are you saying that in those boxes

11   you didn't see any checks that Hartford -- copies of

12   checks that Hartford --

13            A        A check is not going to give you an

14   accounting of expenditures and a balance sheet, it's

15   just a check going out to a subcontractor.  That's

16   an ambiguous fee.

17            Q        All right, other than -- anything

18   else that Hartford did wrong?

19            A        As of this date, I cannot tell you

20   anything factually that they have done wrong.  I do

21   not have enough information.

22                     MR. MEREDITH:  We'll supplement her

23            answers as we move through discovery and see

24            all the documents.

25            Q        Well, Ms. Asher, obviously you were

1     personal relationship with him.

2          Q     And did he ever present and explain

3     these Indemnity Agreements to you?

4          A     No.

5          Q     Did you ever go to his office?

6          A     No.

7          Q     Did you find it strange that an

8     estranged husband -- at the time you all were

9     separated and fussing about your domestic

10    situation -- would be given such an important

11    document as an Indemnity Agreement and that it would

12    be brought to the estranged wife by the husband

13    outside of the insurance office, would you find that

14    strange?

15         A     Uh-huh.  Yes, I do.

16         Q     Particularly when you all weren't

17    talking?

18         A     (Witness nods up and down).

19         Q     And do you know why Mr. McFar --

20         A     McCarley.

21         Q     McCarley didn't ask you to come to

22    his office?

23         A     I don't know why.

24         Q     And I believe you told us that

25    Mr. Crowe made some representations about the

Truesdel & Rusk

1    document he asked you to sign?

2         A         Are you talking about the last

3    bond?

4         Q         The last bond.

5         A         Yes, he did.

6         Q         The one in 2002.

7         A         Yes.

8         Q         I notice this has, and even though

9    I've had cataract surgery, I can see this pretty

10   good, this teeny, tiny print, I mean teeny, tiny

11   print, and it's got a Roman Numeral Paragraph I, II,

12   III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII,

13   XIV, XV, XVI, XVII, XVIII, XIX, XX.  Do you see

14   that?

15        A         Yes.

16                  MR. STATUM:  Object to the form.

17        Q         And I suppose one of the reasons

18   it's teeny, tiny is they can't get all that stuff on

19   two pages unless -- or a page and a half unless they

20   make it teeny, tiny.

21                  MR. STATUM:  Is that a question or

22             a statement?

23        Q         Yeah.  Did you -- when Mr. Crowe

24   brought this to you, did you sit there and read all

25   this little fine print stuff in here?

```
1              A        No, I did not.

2              Q        So how did it happen?  Did he bring

3      it to you and hand it to you and say read this and

4      sign it or how did that happen?  How did it get

5      signed?

6              A        He put it in front of me and said

7      sign this, we have to have it to get the job or to

8      have the job and --

9              Q        Well, now, wait a minute, wait a

10     minute.  You already had the job.

11             A        Well, that's what --

12                      MR. STATUM:  Objection.

13             A        -- makes it funny.

14             Q        No, wait.

15             A        And he also --

16             Q        No, wait, let's go one at a time.

17                      Did you not already have the job

18     and the bond on the job --

19             A        I believe we did.

20             Q        -- before you signed this?

21             A        I believe we did.  I would have to

22     look at the time line, but I believe we did.

23             Q        Well, if you got the job and

24     knowing how government contracts work, you had to

25     have a bond or they wouldn't give you the job?
```

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE

HARTFORD FIRE AND INSURANCE COMPANY, )
                                      )
            Plaintiff,                )
                                      )
    v                                 No.3:06-CV-11
                                      )
CMC CONSTRUCTION COMPANY, INC.,       )
                                      )
                                      )
JERRY G. CROWE, AND TARA ASHER,       )
                                      )
            Defendants.               )
                                      )

THE DEPOSITION OF LAURA MAHLER

TAKEN MAY 20, 2009

VOL. I

Sheila Barron, Court Reporter
1724 Tonalea Road, Knoxville, TN 37909
(865) 584-4552

Mahler/Meredith

1        Q      So, other than the meeting of August

2 19th, 18th and 19th, and the limited calls you have

3 described, have you ever talked to Ms. Asher at

4 anytime, about any matter, period?

5              MR. STATUM: Object to form.

6        A      No.

7 BY MR. MEREDITH:

8        Q      Or had any contact with her?

9        A      Not that I recall, no.

10        Q      All right.  Now, and that's during

11 the whole process from 2003 when you began to

12 accumulate this information on this claim until today;

13 am I correct?

14        A      Yes.

15        Q      Now, other than this initial

16 conversation with the local agent in which you talked

17 to him about the claim and setting up the file, the

18 notification you received from the local agent, how

19 many times have you talked to the local agent?

20        A      I talked to the local agent several

21 times.  I'm sorry.  To the local agent?

22        Q      Yes.

23        A      I probably spoke to the local agent

24 maybe two, three times.

25        Q      Did he tell you these people were

43

Mahler/Meredith

1  had underestimated that project.  And then, they left
2  the room.  We went through -- we looked at the
3  financial records and then Richard Divine, or Dick
4  Divine went out and looked at a couple of the projects.
5  He spent a day and a half looking at different projects
6  and then we went back to Hartford.  We went through our
7  notes and then decided that it was not in Hartford's
8  best interest to provide financial assistance to CMC
9  because
10 of the amount of debt.
11       Q         Was the first request of CMC to you
12 that Hartford assist them by essentially lending them
13 some money to get through this tight time until they
14 could get paid their project?
15       A         I believe so.
16       Q         And was it at that time in August of
17 2003, the contention of the company, CMC that they were
18 owed substantial monies on these projects and were
19 being held up through no fault of their own?
20       A         I believe so.
21       Q         And I believe I saw a letter
22 somewhere at one time where a potential claim -- on
23 these projects against the owner was one point eight
24 million; do you recall that?
25       A         Yes.

49

# CMC

## Construction Company, Inc.

"An Equal Opportunity Employer"

170 Raleigh Road ◊ Oak Ridge, Tennessee 37830 ◊ Phone (865)482-3999 ◊ Fax (865)482-4835



EXHIBIT #10 5-20-09

Mr. Tom McCarley
Palmer & Cay
413 Northshore Dr. SW
Knoxville, TN 37919

July 23, 2003

Re: CMC Construction Co., Inc.

CMC has developed an internal year-end financial statement for your review and comment. We have used our best estimate as to the final amounts of expected payment on two specific projects. All other information is confirmed and accurate.

CMC believes that the chances of winning our legal suits on the UT Alumni and SNS Target Building Substructure to be very strong. We will briefly provide our reasoning for each:

UT Alumni — The subcontract was extended due to lack of design information by the Architectural Firm — McCarty, Holsaple, McCarty. It took MHM approximately eight (8) months to provide a design for the auditorium "cloud" construction. During this critical time, CMC had scaffolding rented for the entire auditorium. CMC requested that MHM or UT pay for the additional scaffolding rental costs and our extended overhead (supervision, office trailer, etc.) costs.

UT stated that they had no problem giving us the additional time but it was their practice not to pay for extended overhead costs. I pointed out to UT that they had previously paid CMC extended overhead costs on the Athletic Academic Building Project completed in 2002.

UT has refused to pay for either costs, leaving us no alternative but to seek legal action. CMC believes we will collect approximately $400,000.00 and have included this amount in our financial statement by adjusting contract amount.

SNS – Target Building Substructure – The construction manager, Knight/Jacobs, specifically the project manager, Richard Davis, met personally with me and asked if CMC would consider giving a price to delete some of our work on the referenced project. According to Mr. Davis, the contract had already been awarded to Caddell-Blaine for the construction of the Target Building, which was to adjoin with our Target Substructure Building. Mr. Davis pointed out to me that it was costing Knight/Jacobs money, due to awarding the project prematurely and before CMC's completion date. In addition, Mr. Davis stated that CMC did not have to give back any overhead and profit and that the

cost difference between CMC's credit and Caddell-Blaine additions would be absorbed by Knight/Jacobs.

This idea seemed to be a no lose situation for CMC as we could decrease our work force and keep our overhead and profit. I informed Mr. Davis that CMC would be glad to go along with Knight/Jacobs request.

Knight/Jacobs issued to CMC three (3) different Request for Proposals (RFP's) that decreased our scope of work. CMC priced and negotiated all three with Knight/Jacobs but to this day have never received a written modification. A written modification must be issued before the work is to be preformed. It is my understanding that Caddell-Blaine has received their written modifications and have been paid for this work. Another point worth mentioning is that all three descope RFP pricings by CMC were only good for sixty (60) calendar days, which all three have expired.

It is CMC's opinion that since Knight/Jacobs has failed to modify CMC's contract, but has allowed Caddell-Blaine to perform this work and modified their contract, from a legal point of view – no credit is warranted. We believe the entire amount of the three descope RFP's, $784,685.00 could legally have to be paid to CMC.

We have not included this amount in our 1.8 million dollar lawsuit, but are considering amending to include in our suit.

CMC's contract is with Knight/Jacobs. CMC and Knight/Jacobs met on numerous occasions in trying to reach a settlement of the three descope RFP's, other RFP's and Requests for Equitable Adjustments (REA's). CMC was verbally informed by Knight/Jacobs that an agreement had been reached but would have to be taken to the owner, UT Battelle, for final approval.

UT Battelle disagrees with our settlement offer and have developed and are continuing to claim consequential damages, punch list work etc. to offset the monies due CMC.

Please note this project does not have any liquidated damages and that CMC was never informed of any potential consequential damages or any additional costs up until I met with Mr. William Thornton of Knight/Jacobs on May 8, 2003. In addition, CMC has a one (1) year warranty to correct any deficiencies, complete punch lists, etc., but have never been informed or been given the opportunity by Knight/Jacobs to make said repairs.

CMC's suit in the amount of $1,867,000.00 includes the following:

|  |  |
|---|---|
| Balance of Contract Unpaid - | $725,197.00 |
| Retainage Due - | $410,423.00 |
| REA's - | $1,497,545.00 |
| Outstanding Change Orders - | $19,115.00 |
| Descope RFP Credits - | $<784,683.00> |
| TOTAL - | $1,867,596.00 |

*CMC will probably add this amount to our suit for a revised amount of $2,651,000.00.

For our financial statement, we have adjusted the contract amount by $731,000.00 reflecting the $1,867,000.00 lawsuit.

In closing, we have tried our best to come up with what we believe will be the end result at the end of the day. Please give me a call with any questions or if you would like to discuss further.

Sincerely,

Jerry G. Crowe, President
CMC Construction Co., Inc.



# THE HARTFORD



*Interoffice Memo*

Accompanying this write-up is a spreadsheet containing the estimated exposure for CMC Construction. The two documents present the results of our initial investigation of CMC's bonded projects.

## *Principal*

CMC was formerly known by the names of the three founding partners, which do not include the current owner, Jerry Crowe. Crowe was hired by CMC in the 1980's as an estimator. As far as we know, CMC has been a viable entity ever since.

Crowe's current staff includes his wife, Tara, and the following:
- two administrative support staff,
- the controller, Rex Armstrong,
- the operations head/project manager, Keith Jamerson (who hired Crowe for CMC during Jamerson's tenure as head of operations for the old CMC), and
- a field superintendent and a few field employees working at one project.

CMC reportedly has no unbonded work, and sees the continued availability of bonding as essential to its survival. According to Crowe, CMC has focused on the public work related to the Department of Energy's Oak Ridge National Laboratory (ORNL), either as a general or a subcontractor.

Crowe admitted that his current financial condition resulted from his bidding error on the Target Building project at the Spallation Neutron Source (SNS) complex[1]. It is obvious Crowe has reduced the size of his operation in recognition of CMC's financial condition. The company has loans from three banks and claims they are "maxed out". One of those loans results from CMC recently mortgaging its office building in Oak Ridge. The Crowes reportedly put a lot of their own money into the company, and their residence is on the market.

Crowe asked us for financial assistance, although he was somewhat unsure of his needs. After some discussion, it appeared that CMC wanted $300,000 to $500,000 in the short term, assuming that it got the contract balance on the SNS Target Building project through a motion for summary judgment. Since that is highly unlikely, it would seem that both the short term and the ultimate, long term situations are worse than that.

## *Projects*

The spreadsheet lists 11 bonded projects. There are open receivables on many of them and open payables every one of them, although all but 1 project can be considered complete for performance purposes (excluding possible warranty issues). The ten "complete" projects are shown in the shaded area of the spreadsheet, while the one with substantial performance remaining is in the unshaded column at left. Very brief discussion of the projects and their circumstances follows:

1. <u>JICS/ORCAS (Joint Institute for Computational Studies/Oak Ridge Center for Advanced Studies)</u>
   CMC is the general contractor on a new two-story 53,000 square foot office building for the State of Tennessee at the ORNL. The project was billed and paid at 35 percent as of our 7/31/03 cut off date. It now stands at about 45 percent complete and the July billing was paid. The completion date was 1/24/04 at cut-off but it will be extended to the end of February 2004 by change orders that are in process. CMC estimates completion at 1/31/04. I have not estimated a completion date, but I think 1/31/04 is attainable. Although some buy-outs exceed budgets, the project now appears to be

---

[1] The SNS facility is essentially a large linear accelerator, used for nuclear research. It consists of many buildings of various types and is located on a very large campus within the confines of the ORNL.

moving well after some initial problems and delays. Management by Keith Jamerson and the site supervision appear adequate. The project is well staffed by subcontractors and the quality of work looks adequate.

2.  SNS Target Building

    CMC was the substructure subcontractor for the Knight/Jacobs (KJ) joint venture on this large, new, special-use building at ORNL. KJ has a contract to construct most portions of the SNS complex at ORNL. Documentation indicates considerable dispute concerning CMC's performance, mostly over time issues. KJ eventually terminated CMC on 2/27/03 replaced CMC with Caddell/Blaine, KJ's superstructure subcontractor, which finished CMC's work. KJ's letters indicate that CMC was late and holding up Caddell/Blaine. The subcontract does not provide for liquidated damages, but there is evidence of a negotiated deduct for CMC's remaining scope of work, which appears in "Other Adjustments" on the spreadsheet. The deduct substantially reduces the contract balance. CMC has filed litigation against KJ for $1.8M, which includes the following:

    - $410,424 of retainage,
    - $725,197 for earned subcontract funds and approved change orders (KJ does not agree with this amount), and
    - $731,975 for $1.4M of extra work claims less the deduct for work done by Caddell/Blaine.

    It should be anticipated that recovery of any of the remaining subcontract funds will be problematic and will not happen in the near future, if at all.

3.  SNS Cooling Tower

    CMC subcontracted with KJ to construct all of this project at the SNS complex. CMC finished this subcontract and the subcontract balance shown on the spreadsheet was paid to CMC following the 7/31/03 cutoff date for the exposure.

4.  SNS CUB (Central Utility Building)

    CMC subcontracted with KJ to construct all of this medium-sized, metal building which houses the support utility functions for the SNS complex. CMC finished this subcontract and all subcontract funds have been paid out.

5.  SNS Water Tank

    CMC subcontracted with KJ to construct all of this elevated, single pedestal water tank at the SNS complex. CMC finished this subcontract and all subcontract funds have been paid out.

6.  Univ. of Tennessee Alumni Memorial Building

    CMC is the general contractor to the University of Tennessee for the renovation of the Alumni Memorial Building. Although I found no evidence of a certificate of substantial completion, the latest punchlist is dated 6/9/03. CMC reports that all punchlist items have been addressed except for replacement of 12 wooden doors by the supplier[2]. Assuming the report of punchlist status is correct, the biggest issue is contract time. CMC claims entitlement to at least 8 months and as much as a year of time for design deficiencies primarily related to the support structure for a "cloud" that hangs in the auditorium, but the obligee doesn't recognize CMC's position. The delay damages carried under "Performance Costs" reflect liquidated damages from the extended contract date of 6/3/01 to 9/2/03 (assuming that the doors are replaced on or about Labor Day). I have also shown another deduct of $77,500 in "Other Adjustments", as it is clear that the obligee will not pay out the contract balance. CMC has filed litigation to recover the contract balance.

7.  Progressive Bank

    CMC is the general contractor for construction of a new bank building. Substantial Completion was certified on 7/21/03, and CMC reports that it has completed the entire punchlist. The "Performance Costs" carry liquidated damages for the 4 months the project was late. Other than those damages, however, there is no known problem that will impair receipt of the balance of contract funds.

8.  CTC Facility
9.  Smoky Mountain Elementary School
10. Univ. of Tennessee Steamline Replacement
11. AMCL (Advance Materials Characterization Laboratory) Sitework

    All four of these projects have been completed and all contract funds have been paid out.

Please contact me if you have any questions concerning any of the foregoing.

---

[2] The correspondence also mentions a mold problem discovered in the mechanical penthouse in June 2003. CMC reports that the source of water was found and the problem was addressed. No documentation was found that verified that, however.