**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | | |
|---|---|---|
| **HARTFORD FIRE INS. CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:06-CV-11** |
| | ) | **(Phillips)** |
| **CMC CONSTRUCTION CO., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on the following motions:

■ Hartford Fire Insurance Company's ("Hartford") Motion for Partial Summary Judgment on its Contractual Indemnity Claim [Doc. 81];

■ Hartford's Motion for Partial Summary Judgment on its Fraudulent Transfer Claim [Doc. 84];

■ Tara Asher's ("Ms. Asher") Motion for Summary Judgment on the Fraudulent Transfer Claim [Doc. 94]; and

■ Ms. Asher's Motion for Summary Judgment on the Contractual Indemnity Claim [Doc. 96].

This lawsuit is based upon an indemnity agreement that was signed by Hartford (the surety), CMC Construction Company, Inc. ("CMC," the principal), Jerry Crowe ("Mr. Crowe," an indemnitor), and Ms. Asher (the other indemnitor). Hartford has moved for partial summary judgment on two claims, requesting that the Court: (1) declare that Mr. Crowe and Ms. Asher are contractually liable for indemnifying Hartford pursuant to the 2002 Indemnity Agreement; and (2) declare that Ms. Asher's transfer of $400,000.00 into Asher Investments Partnership was fraudulent in violation of the Tennessee Uniform Fraudulent Transfer Act, T.C.A. § 66-3-305(a)(1). [Docs.

1

81, 84]. Hartford also seeks to pierce the corporate veil of Asher Investments Partnership under the "reverse piercing" doctrine [Docs. 113, 117]. Ms. Asher has filed cross-motions for summary judgment on the indemnity and fraudulent transfer claims [Docs. 94, 96].

For the following reasons, Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim [Doc. 81] is **GRANTED**, and Ms. Asher's Motion for Summary Judgment on the Contractual Indemnity Claim [Doc. 96] is **DENIED**. Pursuant to Article III of the 2002 Indemnity Agreement, Ms. Asher and Mr. Crowe are jointly and severally liable for indemnifying Hartford for the losses, costs, and attorneys' fees it sustained in furnishing performance and payment bonds to complete CMC's unfinished construction projects, and for settling claims related to those bonds. Hartford is **ORDERED** to provide an updated list of all payments it has made in settling claims related to the bonds and/or to complete CMC's construction projects. This list must be filed with the Court by **SEPTEMBER 24, 2010.**

In addition, the Motions for Summary Judgment on the Fraudulent Transfer Claims [Docs. 84, 94] are **DENIED AS PREMATURE**, with leave for the parties to re-file motions for summary judgment after considering the recently filed exhibits [Doc. 158]. Finally, Hartford's Motion for Partial Summary Judgment on its Fraudulent Transfer Claim [Doc. 84] is **DENIED**, to the extent that it seeks to pierce the corporate veil of Asher Investments Partnership through the "reverse piercing" doctrine.

I.      **BACKGROUND**

As a preliminary matter, the Court notes that it has jurisdiction pursuant to 28 U.S.C. § 1332. Because jurisdiction "is predicated on the diversity of parties, we are obligated to apply state law in resolving the substantive issues presented." Rutherford v. Columbia Gas, 575 F.3d 616, 623 (6th Cir. 2009) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)). Tennessee law therefore governs

the substantive issues in this case.

Defendants Mr. Crowe and Ms. Asher were married on January 3, 1987. In early 1993, Mr. Crowe and Ms. Asher purchased CMC. Mr. Crowe served as CMC's President, and Ms. Asher served as its Secretary. Each owned a fifty-percent interest in the company.

On April 13, 1993, Mr. Crowe (individually and as President of CMC) and Ms. Asher (individually) executed a General Indemnity Agreement (the "1993 Indemnity Agreement") on behalf of Hartford. Under the 1993 Indemnity Agreement, Mr. Crowe and Ms. Asher (collectively, the "Indemnitors") promised to indemnify Hartford (the surety[1]) under certain circumstances. As a general contractor engaged in the construction business, CMC needed Hartford to issue performance bonds for its construction projects.

On October 13, 1996, Mr. Crowe (individually and as President of CMC) and Ms. Asher (individually) executed Addendum No. 1 to the 1993 Agreement (the "1996 Addendum"). This addendum limited Mr. Crowe's and Ms. Asher's liability– that is, the maximum amount they were required to indemnify Hartford– under the 1993 Indemnity Agreement to $250,000.00 per household.

On or about April 17, 2002, Mr. Crowe and Ms. Asher executed a second General Indemnity Agreement (the "2002 Indemnity Agreement"). Ms. Asher argues that Mr. Crowe fraudulently induced her into signing the contract. In particular, Ms. Asher alleges that Mr. Crowe told her that liability was capped at $250,000.00, as in the 1996 Addendum. In reality, the 2002 Indemnity Agreement did not contain the $250,000.00 cap. With the exception of the 1996 Addendum (which

---

[1] A surety is defined as "one who undertakes to pay money or to do any other act in the event that his principal fails therein." In re McNeil, 22 B.R. 408, 413 (Bankr. E.D. Tenn. 1982) (quoting Black's Law Dictionary 1611 (4th ed. 1951)).

modified the 1993 Indemnity Agreement by limiting liability to $250,000.00 per household), the terms of the 1993 Indemnity Agreement and the 2002 Indemnity Agreement were identical.

In reliance upon the 2002 Indemnity Agreement, Hartford furnished performance and payment bonds (the "Bonds") related to CMC construction projects. Under Article III of the 2002 Indemnity Agreement (which is identical to Article III of the 1993 Indemnity Agreement), Mr. Crowe and Ms. Asher agreed to be jointly and severally liable for the following:

> The Indemnitors will indemnify and hold the Surety harmless from all loss, liability, damages and expenses including, but not limited to, court costs, interest and attorney's fees, which the Surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an indemnitor to discharge any obligations under this Agreement, or (3) in enforcing any of the provisions of this Agreement.

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 5]. The 2002 Indemnity Agreement also provided that "the Indemnitors expressly warrant their material or beneficial interest in such Bonds, and in consideration of the furnishing, procuring or continuing of such Bonds, and other good and valuable consideration, the Indemnitors hereby *jointly and severally agree*" to the terms of the 2002 Indemnity Agreement. [Id. at 4] [emphasis added].

In January 2003, Mr. Crowe filed a divorce petition against Ms. Asher. On August 6, 2003, Ms. Asher executed a Limited Partnership Agreement which created Asher Investments Partnership (the "Partnership"). Ms. Asher invested $400,000.00 of the inheritance she received from her father (who died in 2002) into the Partnership. Ms. Asher became a limited partner and owned 90% of the Partnership. Her brothers, Garrett Asher and Ronald Asher, were general partners and owned the remaining 10% interest. Ms. Asher states that she created the Partnership to prevent Mr. Crowe from reaching these assets in the divorce proceeding.

In July 2003, Ms. Asher contacted Laura Mahler, a representative at Hartford. Ms. Asher

alleges that she told Ms. Mahler that she wanted to be kept informed of litigation/settlement related to the Bonds. Ms. Asher further alleges that Ms. Mahler stated that Hartford would keep her informed. Ms. Asher has not provided any evidence– outside her own testimony– that Ms. Mahler made such statement.

In August 2003, representatives from Hartford met with representatives from CMC (including Ms. Asher) to discuss the status of CMC projects. Hartford informed CMC that it was spending significant money to pay claims under the Bonds and/or to complete CMC's unfinished projects. [Hartford's Response in Opposition to Ms. Asher's Motion for Summary Judgment on the Fraudulent Transfer Claim, Doc. 113 at 3]. Following the August 2003 meeting, CMC was unable to complete projects covered by the Bonds. As a result, Hartford made payments under the Bonds because it thought: (1) it "might be liable for the payments under the Bonds or (2) that the payments were necessary and/or advisable to protect Hartford's rights or to avoid or lessen Hartford's liability under the Bonds." [Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 7]. Under Article V of the 2002 Indemnity Agreement, the Indemnitors agreed to the following:

> The Indemnitors shall be liable to Hartford for all payments, plus interest thereon at the maximum rate permitted by law, from the date such payments are made by [Hartford] in belief that either (1) *[Hartford] was or might be liable therefore, or that (2) they were necessary or advisable to protect [Hartford's] rights or to avoid or to lessen [Hartford's] liability.*

[Id. at 5] [emphasis added].

In September 2003, Ms. Asher established the Crowe 2003 Irrevocable Trust (the "Trust"). Ms. Asher used her 90% interest in the Partnership as the corpus of the Trust. Ms. Asher's brothers, Garrett Asher and Ronald Asher, were general partners in the Partnership and co-trustees of the Trust. Ms. Asher states that her former attorney, K. Ray Pinkstaff, recommended that she create the

Partnership and Trust to protect her inheritance from Mr. Crowe in the divorce proceeding.

On April 28, 2005, the Indemnitors received letters advising them that: (1) Hartford had incurred losses of $3,478,125.25; and (2) Hartford expected to be indemnified for its losses. To this date, the Indemnitors have not indemnified Hartford for the losses it sustained in making payments under the Bonds and/or to complete CMC'c construction projects.

As of October 6, 2009[2], Hartford has made payments for a total of $7,720,280.64. Hartford has also sustained attorneys' fees and costs totaling an additional $435,125.82. However, as of that date, Hartford has recouped $5,802,260.34, thereby leaving Hartford with a net loss of $2,353,146.12. For example, Hartford was able to make some recoupment by settling the "Knights/Jacobs" litigation.[3] In its Motion for Partial Summary Judgment [Doc. 81], Hartford argues that the Indemnitors should be held jointly and severally liable for the net loss.

In this action, Hartford seeks to enforce its indemnity rights under the 2002 Indemnity Agreement. Unlike the 1996 Addendum, the 2002 Indemnity Agreement did not contain a provision limiting liability to $250,000 per household. In response, Ms. Asher has filed a Motion for Summary Judgment in which she argues: (1) that the 2002 Indemnity Agreement was a contract of adhesion; (2) that she was fraudulently induced into signing the 2002 Indemnity Agreement; (3)

___

[2] Hartford calculated its loss as of October 6, 2009, the date it filed its Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim [Doc. 92]. Any reference to attorneys' fees, costs, or recoupment, relates to the amount incurred as of October 6, 2009.

[3] The "Knights/Jacobs" litigation was a consolidation of three separate actions assigned to United States District Judge R. Leon Jordan (the lead case being Case No. 3:03-CV-454). The "Knight/Jacobs" litigation related to CMC's work on the Spallation Neutron project located in Oak Ridge, Tennessee. Hartford issued a performance and payment bond in relation to the project. CMC asserted claims against Knight/Jacobs Joint Venture ("Knight/Jacobs") in excess of $1,800,000.00. Knight/Jacobs asserted a counterclaim against CMC in excess of $2,000,000.00, and a counterclaim against Hartford in excess of $2,000,000.00. Hartford settled its claims in October 2005, and Mr. Crowe (acting as President of CMC) settled CMC's claims. Mr. Crowe signed the settlement agreement on behalf of CMC. [*See* Knights/Jacobs Settlement Agreement, Doc. 92-12].

that Hartford breached the 2002 Indemnity Agreement by not keeping her informed of litigation/settlement related to the Bonds; (4) that Hartford breached its fiduciary duty; and (5) that the 2002 Indemnity Agreement violates the public policy of Tennessee. [*See* Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 5]. Thus, the central question revolves around Hartford's duties– both contractually and arising under the law.

With regard to Hartford's contractual duties, Article X of the 2002 Indemnity Agreement provided:

> The Indemnitors expressly waive any notice of the following to which they may be entitled notwithstanding any defenses they otherwise may have been able to assert:
>
> (a)      The execution of any Bonds or the refusal to execute any Bonds;
>
> (b)      Defaults under contracts or any acts which might result either in claims, or in liabilities to the Surety under any Bonds;
>
> (c)      *Any act, fact or information concerning or affecting the rights or liabilities of Hartford or any Indemnitor.*

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 5] [emphasis added]. In addition, Article XIV provided that Hartford could settle claims related to the Bonds, and that it was only required to litigate claims if requested by an indemnitor:

> [Hartford] may adjust, settle, or compromise any claim, demand, suit or judgment upon any Bonds. If requested by an Indemnitor, the Surety shall litigate such claim or demand or defend such suit, or appeal from such judgment, provided that the Indemnitor deposits with the Surety [Hartford], at the time of such request, collateral satisfactory to [Hartford] to be used to pay any judgment rendered plus interest, costs, expenses and fees, including those of [Hartford].

[Id. at 6]. The Indemnitors never requested that Hartford litigate any of the claims related to the Bonds. In addition, the Indemnitors did not post any collateral in relation to those claims.

In addition to the contractual indemnity claim [Doc. 81], Hartford requests that the Court declare Ms. Asher's transfers to the Partnership and Trust as fraudulent under Tennessee's Uniform Fraudulent Transfer Act ("UFTA"), T.C.A. § 66-3-305(a)(1) [Doc. 84]. Ms Asher has filed a cross-motion for Summary Judgment on the fraudulent transfer claim [Doc. 94]. The central issue of this claim relates to Ms. Asher's intent in transferring her assets to the Partnership and Trust.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must construe the facts and draw all inferences therefrom in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zendith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); *see also, e.g.* Bridgeport Music, Inc. v. WB Music Corp., 508 F.3d 394, 397 (6th Cir. 2007) ("The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party."). With regard to issues where the moving party will not bear the ultimate burden of proof at trial, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. The burden then shifts to the non-moving party to demonstrate the existence of genuine issues of material fact. Id. at 324. If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment.

III.     ANALYSIS

    A.     **Mr. Crowe and Ms. Asher Are Jointly and Severally Liable for Indemnifying Hartford for the Losses, Costs, and Attorneys' Fees that Hartford Sustained in Furnishing Bonds to Complete CMC's Construction Projects and for Settling Claims Related to Those Bonds.**

        1.     **Summary of Arguments**

Hartford has moved for partial summary judgment on its contractual indemnity claim against the Indemnitors, Mr. Crowe and Ms. Asher [Doc. 81]. In particular, Hartford seeks indemnification for all losses, costs, and attorneys' fees "that Hartford has incurred, and continues to incur, (1) because of having furnished numerous surety bonds on behalf of CMC (collectively, the 'Bonds'), (2) because of the Indemnitors' failure to discharge their obligations under the indemnity agreements at issue, and (3) in enforcing the provisions of those indemnity agreements." [Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 1-2]. Ms. Asher has responded to Hartford's Motion for Partial Summary Judgment [Doc. 107], and has also filed a cross-motion for summary judgment in which she seeks to rescind the 2002 Indemnity Agreement [Doc. 96]. While Mr. Crowe has not responded to Hartford's Motion for Partial Summary Judgment [Doc. 81], Ms. Asher's arguments apply to him as well. Thus, if the Court decides that the 2002 Indemnity Agreement should be rescinded, it shall be rescinded as against *all* indemnitors.

Ms. Asher argues that the 2002 Indemnity Agreement should be rescinded for five reasons. First, Ms. Asher argues that she was not given an opportunity to review the 2002 Indemnity Agreement prior to signing. [Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 5]. In particular, Ms. Asher appears to argue that the 2002 Indemnity Agreement was an adhesion contract and/or procedurally unconscionable. [Id.]. Second, Ms. Asher argues that she was fraudulently induced into signing the

2002 Indemnity Agreement by Mr. Crowe, and that Mr. Crowe acted as Hartford's agent while doing so. [Id.]. Third, Ms. Asher argues that Hartford breached the 2002 Indemnity Agreement by not keeping her informed of litigation/settlement related to the Bonds. [Id.]. Fourth, Ms. Asher argues that Hartford breached its fiduciary duty by not keeping Ms. Asher informed of such matters. [Id.]. Fifth, Ms. Asher argues that the 2002 Indemnity Agreement violates the public policy of Tennessee. [Id.]. The Court will address each argument in turn.

### 2. The 2002 Indemnity Agreement Was Not An Adhesion Contract Or Procedurally Unconscionable

#### a. The 2002 Indemnity Agreement Was Not An Adhesion Contract

Under Tennessee law, parties to a contract are presumed to understand its content. *See* Philpot v. Tennessee Health Mgmt., Inc., 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007) (citations omitted). "The law imparts on parties to a contract to learn the contents and stipulations of a contract before signing it, and signing it without learning such information is at the party's own peril." Id. However, courts will not enforce contracts that are both adhesive *and* unconscionable. *See* Buraczynski v. Eyring, 919 S.W.2d 314, 320 (Tenn. 1996) (holding that adhesion contracts are unenforceable only when the terms are "beyond the reasonable expectations of an ordinary person, or oppressive or *unconscionable*.") (emphasis added). Thus, the Court must first determine whether the 2002 Indemnity Agreement was an adhesion contract.

The Tennessee Supreme Court has defined an adhesion contract as being "a standardized form offered on what amounts to a 'take it or leave it' basis, without affording the weaker party a realistic opportunity to bargain, and under conditions whereby the weaker party can only obtain the desired product or service by submitting to the form of the contract." Id. Ms. Asher argues that the

2002 Indemnity Agreement was an adhesion contract[4] because she was not given enough time to review it.  As Ms Asher explained:

> Hartford would have the court believe that Ms. Asher had ample opportunity to review and inquire about the 2002 Indemnity Agreement.  However, several facts, which are absent in Hartford's motion and supporting memorandum, demonstrate that Ms. Asher was not given an opportunity to review the 2002 Indemnity Agreement and was misled as to its contents.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 10].

Ms. Asher's claim fails for one important reason: she does not explain the circumstances surrounding the signing of the 2002 Indemnity Agreement.  For example, Ms. Asher does not explain why she did not contact Hartford before signing the 2002 Indemnity Agreement.  She also does not explain why she did not have enough time to sign the contract.  Simply put, Ms. Asher has provided no evidence of any circumstances explaining why she did not understand the contract.  As Tennessee courts have recognized, "[o]rdinarily, one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it."  Ohio Farmers Ins. Co. v. Special Coatings, L.L.C., 2008 WL 5378079, at *17 (M.D. Tenn. Dec. 23, 2008) (quoting Solomon v. First Am. Nat'l Bank of Nashville, 744 S.W.2d 935, 943-94 (Tenn. Ct. App. 1989)).  Barring exceptional circumstances – and none have been provided in this case– "[a]n indemnitor cannot avoid the consequences of an indemnity agreement by claiming he did not read the document."  Ohio Farmers Ins. Co., 2008 WL 5378079, at *17 (citing Nat'l Sur. Corp. v. Buckles, 219 S.W.2d 207, 209 (Tenn.

---

[4] Although Ms. Asher never uses the term "adhesion contract," she argues that the 2002 Indemnity Agreement should be rescinded due to the circumstances surrounding her signing of the contract– which is precisely what courts look at when determining whether a contract is an adhesive contract. See Buraczynski v. Eyring, 919 S.W.2d 314, 320 (Tenn. 1996).

1945)).  For these reasons, Ms. Asher has failed to show that the 2002 Indemnity Agreement was an adhesive contract.

### b.    The 2002 Indemnity Contract Was Not Procedurally Unconscionable

Even if the Court had found that the 2002 Indemnity Agreement was a contract of adhesion, Ms. Asher would still have to show that the contract was unconscionable.  *See* Buraczynski, 919 S.W.2d at 320 (holding that contracts of adhesion are unenforceable only when the terms are "beyond the reasonable expectations of an ordinary person, or oppressive or *unconscionable*.") (emphasis added).  In Tennessee, there are two types of unconscionability:

> Unconscionability may arise from a lack of meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability).  In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

Trinity Indus., Inc. v. McKinnon Bridge Co., 77 S.W.3d 159, 170-71 (Tenn. Ct. App. 2001) (citations omitted).  In this case, Ms. Asher argues that the 2002 Indemnity Agreement was procedurally unconscionable.[5]

As Tennessee courts have recognized, "[w]hether a contract is [procedurally] unconscionable is determined based on the circumstances as they existed at the time the parties executed the contract."  Vintage Health Res., Inc. v. Guiangan, 309 S.W.3d 448, 461 (Tenn. Ct. App. 2009) (citations omitted).  Because Ms. Asher has not provided evidence of the circumstances surrounding

---

[5]  Although Ms. Asher never uses the term "procedurally unconscionable," she argues that the 2002 Indemnity Agreement should be rescinded due to the circumstances surrounding her signing of the contract– which is precisely what courts look at when determining whether a contract is procedurally unconscionable.  *See* Trinity Indus., Inc. v. McKinnon Bridge Co., 77 S.W.3d 159, 170-71 (Tenn. Ct. App. 2001) (citations omitted).

the signing of the 2002 Indemnity Agreement– besides a generalized claim that she was not afforded enough time to review the contract– her "procedural unconscionability" claim fails.

### 3. Ms. Asher Has Not Demonstrated that Hartford Fraudulently Induced Her Into Signing the 2002 Indemnity Agreement

To prevail on a fraudulent inducement claim, five elements must be established: "(1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to reply on the statement; (5) an injury resulting from the reliance." Lamb v. MegaFlight, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000). Ms. Asher argues that Hartford fraudulently induced her into signing the 2002 Indemnity Agreement for three reasons: (1) when Mr. Crowe handed her the 2002 Indemnity Agreement, he acted as Hartford's agent; (2) Mr. Crowe made false representations concerning the liability provision[6]; and (3) because Mr. Crowe was Hartford's agent, Hartford therefore made false representations. [Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 5]. Her argument collapses, however, because she has not proven that Mr. Crowe was Hartford's agent.

The existence of an agency relationship is "a question of fact under the circumstances of the particular case, and is determined by examining the agreement between the parties or the parties' actions." Boren v. Weeks, 251 S.W.3d 426, 432 (Tenn. 2008) (internal quotations and citations omitted). For an agency relationship to arise, the "principal must intend the agent to act for him or her, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them." Thornton v. Allenbrooke Nursing &

---

[6] Ms. Asher alleges that Mr. Crowe told her that she would be responsible for indemnifying Hartford up to $250,000.00 (which was the maximum amount under the 1996 Addendum).

Rehab. Ctr., L.L.C., 2008 WL 2687697, at * 5 (Tenn. Ct. App. July 3, 2008) (quoting 3 Am. Jur. 2d Agency § 15 (2007)). In addition, an agency relationship is only created "at the will and by the act of the principal, and its existence is a fact to be proved by tracing it to some act of the alleged principal, and turns on facts concerning the understanding between the alleged principal and agent." Thornton, 2008 WL 2687697, at * 5 (quoting 3 Am. Jur. 2d Agency § 15 (2007)). When an agent-principal relationship has been established, "the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency." Creech v. Addington, 281 S.W.2d 363, 373 (Tenn. 2009) (citations omitted).

In Tennessee, an agent's authority may be based upon actual or apparent authority. *See* Miliken Group, Inc. v. Hays Nissan, Inc., 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001). In this case, Ms. Asher does not explain how an agent-principal relationship was formed between Mr. Crowe and Hartford.[7] She also does not explain what type of authority Mr. Crowe was given: whether actual or apparent. However, assuming her argument is based upon apparent authority, that claim must fail. The doctrine of "apparent authority" has been defined as follows:

> (1)    such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;
>
> (2)    such authority as he appears to have by reason of the actual authority which he has;
>
> (3)    such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

---

[7] Ms. Asher does not explain how an agent-principal relationship was formed between Mr. Crowe and Hartford. Instead, she offers unsupported statements: "Clearly, because Hartford's insurance agent did not obtain Ms. Asher's signature to the 2002 Indemnity Agreement, but instead made Jerry Crowe his agent for procuring her signature, Crowe acted as an agent of Hartford, and any representations made by Crowe are the representations of Hartford." [Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 10-11.].

Franklin Distrib. Co. v. Crush Int'l, Inc., 726 S.W.2d 926, 930-31 (Tenn. Ct. App. 1986) (citing Southern Ry. Co. v. Pickle, 197 S.W. 675, 677 (Tenn. 1917)).  Notably, "a principal is responsible for the acts of an agent within its apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority."  Southern Ry. Co., 197 S.W. at 675.

Ms. Asher's argument fails because there is no evidence that Hartford intended to confer its authority to Mr. Crowe.  As Tennessee courts make clear, "apparent authority must be established by the acts of the principal, not the acts of the purported agent or the perception of a third party." McInturff v. Battle Ground Acad. of Franklin, 2009 WL 4878614, at *4 (Tenn. Ct. App. Dec. 16, 2009) (citing Boren v. Weeks, 251 S.W.3d at 433).  Ms. Asher has offered nothing but self-serving testimony on this issue:

> Clearly, because Hartford's insurance agent did not obtain Ms. Asher's signature to the 2002 Indemnity Agreement, but instead made Jerry Crowe his agent for procuring her signature, Crowe acted as an agent of Hartford, and any representations made by Crowe are the representations of Hartford.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 10-11].  Ms. Asher's claim fails because she does not identify how the alleged principal – Hartford– granted authority to Mr. Crowe.  In other words, Ms. Asher has failed to explain how Hartford "clothed the agent [Mr. Crowe] with the appearance of authority . . ."  Boren, 251 S.W.3d at 433 (quoting Southern Ry. Co. v. Pickle, 97 S.W. at 677).  Because Mr. Crowe was not acting under apparent authority, Hartford is not liable for any representations made by Mr. Crowe concerning the 2002 Indemnity Agreement.

Finally, even assuming that Mr. Crowe was acting under apparent authority, Ms. Asher has failed to establish that she reasonably relied upon Mr. Crowe's statements.  Under Tennessee law, the elements of fraud include:

. . . an intentional misrepresentation with regard to a material fact; knowledge of the representation's falsity, i.e., it was made 'knowingly' or 'without belief in its truth' or 'recklessly' without regard to its truth or falsity; *the plaintiff reasonably relied on the misrepresentation* and suffered damages; and the misrepresentation relates to an existing or past fact.

Oak Ridge Precision Indus. v. First Tennessee Bank Nat'l Ass'n, 835 S.W.2d 25, 29 (Tenn. Ct. App. 1992) (citations omitted) (emphasis added). In Moore v. Progressive Sav. Bank, the Court of Appeals for the Sixth Circuit held that a plaintiff could not establish a fraudulent inducement claim (under Tennessee law) where the plaintiff had the opportunity to read a bank note before signing it, but failed to do so. 211 F.3d 1269, 2000 WL 420675, at *4 (6th Cir. 2000) (unpublished table decision). As the court in Moore explained:

> However, Moore's [the plaintiff alleging fraudulent inducement] argument that PSB omitted the one-year term of the loan is unavailing given that she signed the note that clearly states the one-year term. The fact that Moore failed to read the note does not mean that PSB omitted this term; instead she was negligent in disregarding it. . . .

Id. Like the plaintiff in Moore, Ms. Asher did not read the 2002 Indemnity Agreement before signing it. As Tennessee courts make clear, "one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it." Solomon, 744 S.W. 2d at 943. Because Ms. Asher did not read the 2002 Indemnity Agreement, she cannot establish that she reasonably relied upon Mr. Crowe's statement. Thus, even if she had established an agency relationship between Mr. Crowe and Hartford, her fraudulent inducement claim would still fail.

### 4. Hartford Was Not Required to Keep the Indemnitors Informed of Litigation/Settlement Related to the Bonds

#### a. Summary of Arguments

Ms. Asher argues that Hartford violated its contractual and fiduciary duties by not keeping the Indemnitors informed of litigation/settlement related to the Bonds. Her argument consists of

three steps. First, she argues that Hartford had a duty to keep the Indemnitors informed of litigation/settlement related to the Bonds, especially about the "Knight/Jacobs" litigation. Second, she argues that by not keeping the Indemnitors informed, Hartford breached its contractual duties under the 2002 Indemnity Agreement (principally, the attorney-in-fact-provision contained in Article XII). Alternatively, Ms. Asher argues that Hartford breached its fiduciary duty– that is, a duty to disclose material information– arising from its surety/indemnitor/principal relationship. Third, Ms. Asher argues that because Hartford either breached the contract or violated its fiduciary duty, the 2002 Indemnity Agreement should be rescinded. To address these claims, the Court must determine whether (1) Hartford had a contractual duty to keep the Indemnitors informed of these matters, and if so, whether it breached such duty; and (2) whether Hartford had a fiduciary relationship with the Indemnitors, and if so, whether it breached its fiduciary duty. The Court will address the contractual claim first.

> **b.    Hartford Did Not Have  Contractual Duty to Keep the Indemnitors Informed of Litigation/Settlement Related to the Bonds**

Ms. Asher argues that the 2002 Indemnity Agreement should be rescinded because Hartford materially breached the contract. As Tennessee courts have held, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." McClain v. Kimbrough Constr. Co., 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990); *see also* Madden Phillips Constr., Inc. v. GGAT Dev. Corp., 2009 WL 3064898, at * 7 (Tenn. Ct. App. Sept. 25, 2009) (recognizing that "a party who commits the first uncured material breach of contract may not recover damages for the other party's material breach.") (citations omitted). Thus, the Court must examine the relevant provisions of the 2002 Indemnity Agreement.

As the Tennessee Supreme Court has stated, "[t]he cardinal rule for interpretation of

contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975). "If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms." Pitt v. Tyree Org., 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citing Petty v. Sloan, 277 S.W.2d 355 (Tenn. 1955)). "The language used in a contract must be taken and understood in its plain, ordinary, and popular sense." Pitt, 90 S.W.3d at 252 (citations omitted). "If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties." Pitt, 90 S.W. 3d at 252 (citing Sutton v. First Nat'l Bank of Crossville, 620 S.W.2d 526 (Tenn. Ct. App. 1981)). Unambiguous contracts will be enforced as written "even if enforcement produces harsh results." Memphis Hous. Auth. v. Thompson, 38 S.W.3d 504, 511 (Tenn. 2001).

Despite these general rules, Ms. Asher argues that indemnity contracts should be treated differently. The Court has previously rejected this argument:

> In Tennessee, there is no case law to suggest indemnity agreements would be read any differently than regular contracts. Thus, unless the context otherwise requires, indemnity agreements should be applied according to their terms. While the terms of a contract are generally a question of fact, interpretation of the contract is a question of law.

Lyndon Prop. Ins. Co. v. Houston Barnes, Inc., 2005 WL 1840254, at *4 (E.D. Tenn. July 26, 2005). Thus, the Court recognizes that "[i]ndemnity agreements are enforceable under Tennessee law, and like other contracts, they are to be enforced according to their plain and unambiguous terms." U.S. Fid. & Guar. Co. v. Weed, 2009 WL 77262, at *3 (M.D. Tenn. Jan. 8 2009).

In applying the general rules of contract interpretation, the Court must first determine whether the 2002 Indemnity Agreement was ambiguous. Ambiguity only exists if a contract is "of

uncertain meaning and may be fairly understood in more ways than one." Wilson County Bd. of

Educ. v. Wilson County Educ. Ass'n, 2010 WL 2612691, at *5 (Tenn. Ct. App. June 30, 2010)

(quoting Farmers-Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn. 1975)).  Under the plain

language of Article X of the 2002 Indemnity Agreement, Hartford was not required to keep the

Indemnitors informed of litigation/settlement related to the Bonds.  In fact, the Indemnitors waived

their right to notice.  Article X provided:

> The *Indemnitors expressly waive any notice* of the following to which they may be entitled notwithstanding any defenses they otherwise may have been able to assert:
>
> (a)    The execution of any Bonds or the refusal to execute any Bonds;
>
> (b)    Defaults under contracts or any acts which might result either in claims, or in liabilities to the Surety under any Bonds;
>
> (c)    *Any act, fact or information concerning or affecting the rights or liabilities of Hartford or any Indemnitor.*

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its

Contractual Indemnity Claim, Doc. 92 at 5] [emphasis added].  When the Indemnitors waived their

right to notice of "information concerning or affecting" their rights or liabilities, they waived their

right to notice of litigation/settlement related to the Bonds.  The litigation and settlement of claims

affects the Indemnitors' "rights or liabilities" because it determines what amount the Indemnitors

are required to reimburse Hartford.

To the extent that Ms. Asher argues that the waiver provision was modified as a result of a

conversation with Laura Mahler (a Hartford representative), that argument is rejected.[8]  Article XX

provided that the 2002 Indemnity Agreement could only be modified by Hartford's written approval:

---

[8]  Ms. Asher alleges that in July 2003 she contacted Laura Mahler and requested to be kept informed of litigation related to the Bonds.  Ms. Asher also claims that she contacted Ms. Mahler again in Fall 2003.  According to Ms. Asher, Ms. Mahler promised that Hartford would keep her informed of litigation related to the Bonds.

> The Indemnitors have read and understand this Agreement. No separate agreements or understandings change the terms of this Agreement, and *no terms may be waived or changed without [Hartford's] written approval.*

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 6] [emphasis added]. With regard to the modification of contracts– and in particular, provisions that state a contract may only be modified through written approval– Tennessee law provides:

> If any such security agreement, note, deed of trust, *or other contract* contains a provision to the effect that no waiver of any terms or provisions thereof shall be valid unless such waiver is in writing, no court shall give effect to any such waiver *unless it is in writing.*

T.C.A. § 47-50-112(c) (emphasis added). Because Article XX provided that the modification of the contract must be in writing, any oral statements made by Ms. Mahler have no effect on the 2002 Indemnity Agreement.

Ms. Asher also argues that Hartford breached the 2002 Indemnity Agreement by settling claims without Ms. Asher's permission, and for settling those claims for less than "full value":

> Hartford wrongfully chose to settle the Knights/Jacobs litigation out of its own self-interest and did so in bad faith. They settled the claim for barely one-forth of its value. . . . Any doubt as to whether Hartford breached its duties by failing to pursue litigation or a higher settlement is a question of material fact and precludes summary judgment.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 6-7]. However, under the clear language of Article XIV, the Indemnitors agreed that Hartford could settle claims without their permission. In fact, Hartford was only required to litigate claims if the Indemnitors requested litigation and provided collateral:

> [Hartford] may adjust, settle, or compromise any claim, demand, suit or judgment upon any Bonds. If requested by an Indemnitor, the Surety shall litigate such claim or demand or defend such suit, or appeal from such judgment, provided that the Indemnitor deposits with the Surety [Hartford], at the time of such request, collateral

satisfactory to [Hartford] to be used to pay any judgment rendered plus interest, costs, expenses and fees, including those of [Hartford].

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 6]. The Indemnitors never requested that Hartford litigate any claims related to the Bonds. Nor did the Indemnitors provide any collateral. As Hartford correctly recognizes, "[b]ecause the Indemnitors at no time requested that Hartford litigate any claim and at no time posted any collateral, Hartford possessed the express contractual right to settle any claim against the Bonds to protect Hartford's rights or to avoid or to lessen Hartford's liability." [Id. at 28]. Combined with the waiver provision of Article X, Hartford was (1) not required to keep the Indemnitors informed of litigation/settlement related to the Bonds; and (2) not required to litigate claims related to the Bonds unless the Indemnitors requested such action and provided collateral.

Finally, Ms. Asher attempts to limit her liability (and Mr. Crowe's) by arguing that she agreed to indemnify Hartford only for "against loss." Under Tennessee law, there are two types of indemnity agreements. There are agreements to indemnify "against loss" and there are agreements to indemnify "against liability." *See* Long v. McAllister, 221 S.W.3d 1, 11 (Tenn. Ct. App. 2006). When an indemnitor agrees to indemnify "against loss," the indemnitor is not liable until the surety makes payment on the obligation for which the surety is liable. Id. In other words, in an "against loss" agreement, the Indemnitors are not liable until the surety – in this case, Hartford– makes payments under the Bonds. In contrast, when an indemnitor agrees to indemnify "against liability," an indemnitor is required "to pay certain sums of money or to perform other acts that will prevent harm or loss to the indemnitee. . . ." Id. As the Tennessee Supreme Court has explained, "[t]he distinction between an indemnity against liability and an indemnity against loss is that in the former, the essence of the contract is that the event shall not occur while in the latter, the indemnity is

against the consequences of the event if it should happen." Id.

While Ms. Asher argues that she agreed to indemnify Hartford only for "against loss," that argument is rejected. Under the plain language of Article III, the Indemnitors promised to indemnify Hartford "against loss" and "against liability":

> The Indemnitors will indemnify and hold the Surety harmless from *all loss, liability*, damages and expenses including, but not limited to, court costs, interest and attorney's fees, which the Surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an indemnitor to discharge any obligations under this Agreement, or (3) in enforcing any of the provisions of this Agreement.

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 23] [emphasis added]. Article IV makes this point even clearer. Under Article IV, the Indemnitors agreed to the following:

> On demand by [Hartford], the Indemnitors will pay [Hartford] the amount deemed necessary by [Hartford] to protect itself from all losses or expenses as soon as [Hartford] determines that liability exists, *whether or not [Hartford] has made any payment* or created any reserve.

[Hartford's Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 116 at 16] [emphasis added]. Because the Indemnitors were required to protect Hartford from loss even before Hartford made payments under the Bonds, the Indemnitors agreed to indemnify Hartford against both "loss" and "liability." Consequently, the Indemnitors breached Article III of the 2002 Indemnity Agreement by failing to prevent Hartford from sustaining losses.

   c. **Hartford Did Not Have a Fiduciary Duty to Keep the Indemnitors Informed of Litigation/Settlement Related to the Bonds**

Ms. Asher argues that the 2002 Indemnity Agreement should be rescinded because Hartford breached its fiduciary duty. In particular, Ms. Asher argues that Hartford failed to keep the Indemnitors informed of litigation/settlement related to the Bonds:

By the time Hartford alleges that Ms. Asher breach the Indemnity Agreement by not paying on demand, Hartford had failed to keep Ms. Asher informed as to anything for more than one and a half years. During that time, Hartford failed in upholding its fiduciary duties, admittedly engaged in self-dealing, and breached its duties of good faith and fair dealing.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 5-6]. Her argument consists of five steps: (1) insurance contracts impose a fiduciary duty on parties, which includes the duty to disclose material information; (2) surety bonds are insurance contracts; (3) because surety bonds are insurance contracts, the surety has a fiduciary duty of disclosing material information to the principal and indemnitors; (4) the status of litigation/settlement related to the Bonds is material information; and (5) Hartford breached its fiduciary duty – in particular, its duty to disclose– by not keeping the Indemnitors informed of litigation/settlement related to the Bonds.

As a general rule, "a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentations." <u>Macon County Livestock Mkt., Inc. v. Kentucky State Bank</u>, 724 S.W.2d 343, 349 (Tenn. Ct. App. 1986). However, "liability for nondisclosure can arise only in the cases *where the person being held responsible had a duty to disclose* the facts at issue." <u>Id</u>. (emphases added). The duty to disclose arises in three situations:

1. Where there is a previous definite fiduciary relation between the parties.

2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.

3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class.

<u>Domestic Sewing Mach. Co. v. Jackson</u>, 83 Tenn. 418, 424-25 (1885). Ms. Asher argues that a

surety bond is a contract of insurance, and therefore imposes a fiduciary duty upon the surety to keep the principal and indemnitors informed of material information.

Ms. Asher's argument collapses because Hartford – the surety– did not owe a fiduciary duty to the Indemnitors. No court in Tennessee has ever held that a surety owes a fiduciary duty to its principal (CMC) or indemnitors (Mr. Crowe and Ms. Asher). In fact, the United States Bankruptcy Court for the Eastern District of Tennessee has held that a surety does not owe a fiduciary duty to its principal or indemnitors under Tennessee law. In re McNeil, 22 B.R. 408, 413 (Bankr. E.D. Tenn. 1982). In In re McNeil, the president of Cassel Brothers (the principal) executed an indemnity agreement on behalf of USF&G (the surety). Id. at 409. As a general contractor engaged in the construction business, Cassel Brothers needed USF&G to issue performance bonds for its construction projects. Under the agreement, Cassel Brothers and its president (both individually and in his official capacity) "agreed to indemnify USF&G . . . for any expenses or loses incurred by USF&G as a result of performance bonds provided on behalf of Cassel Bros." Id. at 409-10.

After executing the indemnity agreement, Cassel Brothers was unable to finish many of its construction projects. Id. at 411. As a result, USF&G– like Hartford in the present case– made payments under the performance bonds and completed some of the unfinished projects. Id. USF&G then filed a contractual indemnity claim against Cassel Brothers and its president. Id. Like the defendants in the present case, the principal (Cassel Brothers) and indemnitor (the president of Cassel Brothers) asserted a counterclaim against the surety, arguing that USF&G breached its fiduciary duty. Id. The counterclaim was premised upon the notion that "a fiduciary relationship existed between Cassel Bros. and USF&G and that there was an affirmative duty upon USF&G to disclose all material facts solely within its possession." Id. at 413. As the court explained, "[i]t is the theory of the counterclaimants that a fiduciary relationship existed between Cassel Bros. and

USF&G and that there was an affirmative duty upon USF&G to disclose all material facts solely within its possession." Id. This is the same argument that Ms. Asher has raised.

In In re McNeil, the court ruled in favor of the surety and dismissed the counterclaims. Id. In particular, the court held that sureties do not owe a fiduciary duty under Tennessee law to principals or indemnitors. Id. As the court stated, there is "no reported Tennessee decision on the issue of whether a fiduciary relationship exists between a principal and a compensated surety." Id. As the court explained:

> This court does not believe that the counterclaimants [the principal and indemnitor] reposed any special confidence or trust in USF&G [the surety] analogous to that found in a classic fiducial relation. The counterclaimants paid USF&G premiums in consideration of the issuance of bonds which Cassel Bros. had to furnish to obtain contracts for sizable construction projects. This court is not prepared to hold that this relationship should be characterized as fiducial, particularly since the Supreme Court of Tennessee has stated that no fiduciary relationship generally exists between an insured and an insurer when the company is attempting to settle a claim directly with its insured.

Id. (citations omitted). Courts from other jurisdictions have also held that a surety does not owe a fiduciary duty to its principal or indemnitor. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Turtur, 892 F.2d 199, 207 (2d Cir. 1989) (holding that "in general, a surety does not owe a fiduciary duty to its principal" under New York law) (citing In re McNeil, 22 B.R. at 413); Guar. Co. of North America v. City of Cleveland, 1997 WL 614406, at *5 (N.D. Ohio Sept. 24, 1997) (same under Ohio law); Northwestern Nat'l Ins. Co. of Milwaukee v. Barney, 1988 WL 215411, at *7 (N.D. Ohio Nov. 23, 1988) (stating that "a surety does not owe a fiduciary duty to its principals" under Ohio law); Travelers Prop. & Cas. Ins. Co. v. Triton Marine Constr. Corp., 473 F. Supp. 2d 321, 332-33 (D. Conn. 2007) (recognizing that "[i]n general, a surety does not owe a fiduciary duty to its principal," and explaining that a "surety– who under the indemnity agreement had the exclusive right to determine whether any claims on the bond should be paid, settled, defended, or appealed– was not

'under a duty to represent the interest' of [the principal]").

Ms. Asher also argues that the "attorney-in-fact" (or power of attorney) provision in the 2002 Indemnity Agreement created a fiduciary relationship. Article XII provided:

> The Indemnitors irrevocably constitute, appoint and designate [Hartford] as their attorney-in-fact *with the right, but not the obligation*, to exercise all rights of the Indemnitors assigned to [Hartford], and in the name of the Indemnitors, to execute and deliver any other assignments or documents deemed necessary by [Hartford] to effectuate and exercise the rights given it under this Agreement including, but not limited to, the right to endorse the name of any Indemnitor upon any securities, checks, drafts or evidences of debt. The Indemnitors hereby ratify and confirm all acts and actions taken by [Hartford] as such attorney-in-fact.

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 6] [emphasis added]. Under Article XII, Hartford had the right, but not the obligation, to exercise all rights assigned to Hartford. Under Article VII, these rights included:

> A.    All rights of the Indemnitors in, arising from, or related to such Bonds or any bonded or unbonded contracts or any extensions, modifications, alterations or additions thereto;
>
> B.    All right, title and interest of the Indemnitors in and to (1) the work performed, (2) all supplies, tools, plant, machinery, equipment and materials on or near work sites or elsewhere, and  (3) all materials purchased for or chargeable to the contract which may be in the process of manufacture, construction or transportation, or any storage anywhere.

[Id.].

Under Tennessee law, a fiduciary duty arises when one person acts on behalf of another person under an "unrestricted power of attorney." *See* Matlock v. Simpson, 902 S.W.2d 384, 385-86 (Tenn. 1995); Childress v. Currie, 74 S.W.3d 324, 328 (Tenn. 2002) (recognizing that "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party."). However, the power of attorney must be exercised before the fiduciary

duty arises. *See* <u>Childress</u>, 74 S.W.3d at 329 ("a confidential relationship arises– through a fiduciary relationship– between a principal and attorney-in-fact to a power of attorney *when the power of attorney has been exercised* and the attorney-in-fact was active in its procurement") (emphasis added). As the Tennessee Supreme Court has stated, "an unexercised power of attorney does not in and of itself create a confidential relationship and we clarify <u>Matlock</u> to the extent it suggests otherwise. . . . When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." <u>Id</u>.

Ms. Asher argues that Hartford exercised Article XII by settling claims related to the Bonds on behalf of CMC:

> Paragraph XII of both agreements [the 1993 Indemnity Agreement and the 2002 Indemnity Agreement] appoints Hartford as attorney-in-fact for the indemnitors. Utilizing its power of attorney, Hartford settled litigation took over projects begun by CMC, incurring expenditures and losses which are now claimed to be more than $7,000,000. Hartford did all of this without consulting Ms. Asher or keeping her updated.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 107 at 12]. However, Ms. Asher has not provided any evidence that Hartford settled claims on behalf of CMC, Mr. Crowe, or Ms. Asher. Each action that Hartford took in relation to the Bonds (including the "Knight/Jacobs" litigation) was done in Hartford's name. CMC, acting through Mr. Crowe (as president), settled its own claims in the "Knight/Jacobs" litigation.[9]

Moreover, Hartford did not take any action on behalf of CMC, Mr. Crowe, or Ms. Asher in relation to the other claims asserted under the Bonds. Because Hartford never litigated or settled claims on behalf of CMC, Mr. Crowe, or Ms. Asher, it never exercised the attorney-in-fact provision

---

[9] Mr. Crowe, acting as President of CMC, signed the Knight/Jacobs Settlement Agreement. [*See* Knight/Jacobs Settlement Agreement, Doc. 92-12].

of Article XII.  As a result, Article XII did not create a fiduciary duty.[10]

In sum, the Court finds that the surety (Hartford) did not owe a fiduciary duty to either the principal (CMC) or the Indemnitors (Mr. Crowe and Ms. Asher).  First, no court in Tennessee has ever held that a surety owes a fiduciary duty to its principal or indemnitor.  Second, the Court finds the reasoning in In re McNeil persuasive.  22 B.R. at 413.  Third, courts in other jurisdictions agree that a surety does not owe a fiduciary duty to its principal or indemnitor.  Fourth, Hartford did not exercise an unrestricted power of attorney.  Because Hartford did not owe a fiduciary duty to CMC, Mr. Crowe, or Ms. Asher, it was not required to keep them informed of litigation/settlement related to the Bonds.

**5.      The 2002 Indemnity Agreement Does Not Violate the Public Policy of Tennessee**

Ms. Asher argues that the 2002 Indemnity Agreement violates the public policy of Tennessee, and therefore should be rescinded.  As the Tennessee Supreme Court has stated, contract provisions that are contrary to public policy must be invalidated.  Purkey v. Am. Home Assurance Co., 173 S.W.3d 703, 705 (Tenn. 2005).  A contact does not violate public policy unless it "tends to harm the public good, public interest, or public welfare, or to conflict with the constitution, laws, or judicial decisions of Tennessee."  Spiegel v. Thomas, Mann & Smith, P.C., 811 S.W.2d 528, 530 (Tenn. 1991).  A contract will also be invalidated "[i]f the *purpose* underlying the agreement contravenes public policy."  Vintage Health Res., Inc. v. Gujangan, 309 S.W.3d 448, 465 (Tenn. Ct. App. 2009) (emphasis added).  "As a general matter, the issue of whether the purpose of a contract violates public policy is a question of law to be determined by the courts."  Blackburn & McCune,

---

[10]  The Court will not decide whether Article XII of the 2002 Indemnity Agreement– if exercised– would create an unrestricted or restricted power of attorney.  Having determined that Hartford never exercised its rights under the attorney-in-fact provision, the Court will not decide this issue.

P.L.L.C. v. Pre-Paid Legal Servs., Inc., 2010 WL 2670816, at *19 (Tenn. Ct. App. June 30, 2010)

(citing Vintage, 309 S.W.2d at 464).

Ms. Asher argues that Articles X (the provision in which the Indemnitors agreed to waive

their right to notice) and XIV (the provision in which the Indemnitors granted Hartford authority to

settle claims related to the Bonds) of the 2002 Indemnity Agreement violate the public policy of

Tennessee.  With regard to Article X, Ms. Asher argued the following:

> A fiduciary cannot contract away its fiduciary duties so that it can act in its own self-
> interest.  Any attempt to do so, such as Article X, is void as a matter of public policy.

[Ms. Asher's Response to Hartford's Motion for Partial Summary Judgment on its Contractual

Indemnity Claim, Doc. 107 at 28].  Her argument fails for two reasons.  First, as the Court

previously explained, Hartford (as the surety) did not owe a fiduciary duty to the Indemnitors or the

principal.[11]  Second, other courts have recognized that similar waiver provisions in indemnity

contracts do not violate the public policy of Tennessee.  In Developers Sur. & Indem. Co. v. Martin,

the United States District Court for the Eastern District of Tennessee upheld a similar waiver

provision.  2006 WL 1984425, at *7 (E.D. Tenn. July 14, 2006).  In that case, the court upheld an

indemnity agreement which provided that the "failure of the surety (Developers) to give notice of

a claim 'shall in no way relieve Principal and Indemnitors, or any of them, of any liability, duty or

obligation hereunder.'"  Id.  In particular, the court held that the provision did not violate the public

policy of Tennessee.  Id.  This provision is very similar to Article X of the 2002 Indemnity

Agreement, which provided that "[t]he Indemnitors expressly waive any notice of . . . [a]ny act, fact

or information concerning or affecting the rights or liabilities of Hartford or any Indemnitor."

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its

---

[11] *See* Part III.A.4

Contractual Indemnity Claim, Doc. 92 at 5].

The court also upheld a provision that gave the surety "in its sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed." Developers Sur., 2006 WL 1984425, at *7 (citing Safeco Ins. Co. of Am. v. Criterion Inv. Corp., 732 F. Supp. 834, 841 (E.D. Tenn. 1989) ("Provisions in indemnity agreements granting to the indemnitor the right to compromise and settle claims . . . have been upheld as not against public policy and enforced by the courts.")). This provision is very similar to Article XIV of the 2002 Indemnity Agreement, in which the Indemnitors agreed that Hartford could settle claims related to the Bonds without the permission of the Indemnitors. Accordingly, the Court finds that the 2002 Indemnity Agreement does not violate the public policy of Tennessee.

For the foregoing reasons, Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim [Doc. 81] is **GRANTED**, and Ms. Asher's Motion for Summary Judgment on the Contractual Indemnity Claim [Doc. 96] is **DENIED**. Pursuant to Article III of the 2002 Indemnity Agreement, Ms. Asher and Mr. Crowe are jointly and severally liable for indemnifying Hartford for the losses, costs, and attorneys' fees it sustained in furnishing Bonds to complete CMC's unfinished construction projects, and for settling claims related to those Bonds. Hartford is **ORDERED** to provide an updated list of all payments it has made in settling claims related to the Bonds and/or to complete CMC's construction projects. This list must be filed with the Court by **SEPTEMBER 24, 2010.**

B.    **It is Premature for the Court to Determine Whether the Partnership and Trust Were Fraudulent Conveyances**

1.    **Mr. Crowe is a "Creditor" Within the Meaning of the Tennessee Uniform Fraudulent Transfer Act**

Having decided that Mr. Crowe and Ms. Asher are fully responsible for their obligations

under the 2002 Indemnity Agreement, the next question is: What assets may Hartford reach to satisfy its claims?  In its Motion for Partial Summary Judgment on its Fraudulent Conveyance Claim [Doc. 84], Hartford argues that Ms. Asher fraudulently transferred assets to the Partnership and Trust in violation of the Uniform Fraudulent Transfer Act ("UFTA"), T.C.A. § 66-3-305(a)(1).  Under the UFTA, if a creditor establishes that a transfer was fraudulent, the creditor may seek the following relief:

> (1)     Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>
> (2)     An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by title 26;
>
> (3)     Subject to the applicable principles of equity and in accordance with applicable rules of civil procedure:
>
>> (A)     An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>>
>> (B)     Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
>>
>> (C)     Any other relief the circumstances may require.

T.C.A. § 66-3-308(a).  Transfers are "fraudulent"– and therefore may be set aside– if they were made with the "actual intent to hinder, delay, or defraud any creditor of the debtor."  T.C.A. § 66-3-305(a)(1).

Hartford argues that Ms. Asher's transfer of $400,000.00 to the Partnership was made with the intent to hinder and/or defraud Hartford– that is, to prevent Hartford from invoking its indemnity rights.  In response, Ms. Asher alleges that she established the Partnership to protect her inheritance from Mr. Crowe in the divorce proceeding.  As background, Mr. Crowe filed a divorce petition against Ms. Asher in January 2003.  In August 2003, Ms. Asher established the Partnership.  Ms.

Asher transferred the inheritance she received from her father ($400,000.00) into the Partnership. In September 2003, Ms. Asher created the Trust. Ms Asher used her 90% interest in the Partnership as the corpus of the Trust.

As an initial matter, the Court must determine whether Mr. Crowe or Hartford were "creditors" at the time of the transfer. The UFTA defines "creditor" as a "person who has a claim." T.C.A. § 66-3-302(4). In turn, "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured, disputed*, undisputed, legal, equitable, secured or unsecured." T.C.A. § 66-3-302(3) (emphasis added). Thus, even contingent, unmatured, or disputed rights to payment can give rise to creditor status. Id.

Mr. Crowe qualified as a "creditor" at the time Ms. Asher transferred $400,000.00 into the Partnership because he possessed a contingent right to contribution from Ms. Asher. Under Article V of the 2002 Indemnity Agreement, Mr. Crowe and Ms. Asher agreed to be jointly and severally liable for payments made under the Bonds. Article V provided, in relevant part:

> The Indemnitors shall be liable to Hartford for all payments, plus interest thereon at the maximum rate permitted by law, from the date such payments are made by [Hartford] in belief that either (1) [Hartford] was or might be liable therefore, or that (2) they were necessary or advisable to protect [Hartford's] rights or to avoid or to lessen [Hartford's] liability.

[Hartford's Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Contractual Indemnity Claim, Doc. 92 at 5]. In Tennessee, a co-guarantor on a joint obligation has a right to contribution from other co-guarantors. *See* Young v. Kittrell, 833 S.W.2d 505, 508 (Tenn. Ct. App. 1992). However, the "right to contribution among contract debtors *does not arise until* the party actually pays more than his or her share of a joint obligation." Id. (emphasis added) (citing Frazier v. Frazier, 221 430 S.W.2d 655, 660 (Tenn. 1968) (holding that persons jointly liable on a promissory note could not seek contribution from each other until one party "paid in excess of his

share of the entire promissory oblgiation.")).  The right to contribution is a right to payment, but such right is *contingent* upon a co-guarantor paying more than his or her share of the joint obligation.  Because Mr. Crowe and Ms. Asher were jointly and severally liable under the 2002 Indemnity Agreement, and because the agreement was executed before Ms. Asher established the Partnership, Mr. Crowe had a contingent right to contribution from Ms. Asher at the time she transferred assets into the Partnership.  Mr. Crowe therefore qualifies as a "creditor" for purposes of the UFTA.

Hartford has standing under the UFTA even though the alleged fraudulent transfer (the transfer of $400,000.00 into the Partnership) involved a different creditor, Mr. Crowe.  In Perkins v. Brunger, the Tennessee Court of Appeals addressed standing requirements under the UFTA.  303 S.W.3d 688, 691 (Tenn. Ct. App. 2009).  In Perkins, the court recognized that if a party qualifies as a "creditor" (before or after the alleged fraudulent transfer), that party has standing to challenge any alleged fraudulent transfer involving a creditor, even if the fraudulent transfer involved a different creditor.  In other words, if Hartford currently qualifies as a "creditor," it may assert a claim under the UFTA even though the alleged fraudulent transfer involved a different creditor, Mr. Crowe.

Hartford currently qualifies as a "creditor."  In this Memorandum and Order, the Court previously ruled in favor of Hartford on its contractual indemnification claim.  Thus, the Indemnitors – including Ms. Asher– are jointly and severally liable to Hartford for all losses, costs, and attorneys' fees that Hartford incurred and continues to incur for furnishing surety bonds and/or to finish construction projects that were not completed by CMC.  Hartford has standing under the UFTA because: (1) Mr. Crowe qualified as a "creditor" during the alleged fraudulent transfer– that is, Mr. Crowe was a "creditor" when Ms. Asher transferred $400,000.00 into the Partnership; and (2) Hartford currently qualifies as a "creditor" because the Indemnitors are jointly and severally

liable under the 2002 Indemnity Agreement, and therefore Hartford has a "right to payment." As the UFTA makes clear, all creditors are protected regardless of "whether the creditor's claim arose *before or after* the transfer was made or the obligation was incurred . . ." T.C.A. § 66-3-305 (emphasis added).

> ### 2. It is Premature for the Court to Determine Ms. Asher's Intent in Transferring Assets to the Partnership and Trust

Under the UFTA, transfers are "fraudulent"– and therefore may be set aside– if they were made with the "actual intent to hinder, delay, or defraud any creditor of the debtor." T.C.A. § 66-3-305(a)(1). Hartford argues that Asher's transfer of $400,000.00 to the Partnership was made with the intent to hinder and/or defraud Hartford from invoking its indemnity rights. In response, Ms. Asher argues that she transferred the assets to prevent her ex-husband, Mr. Crowe, from reaching those assets (the inheritance from her father) in the divorce proceeding.

To determine whether a transfer was made with the "actual intent" to hinder or defraud a creditor, courts consider the following factors, including whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation

incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

T.C.A. § 66-3-305(b).  Thus, this finding depends "upon the facts and circumstances of each case; such fraud is typically proven by circumstantial evidence." Nadler v. Mountain Valley Chapel Bus. Trust, 2004 WL 1488544, at *2 (Tenn. Ct. App. June 30, 2004) (citing Macon Bank & Trust Co. v. Holland, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986)).  Circumstantial indicators are referred to as "badges of fraud," and have been described as "any fact[s] that throw[s] suspicion on the transaction and call[s] for an explanation." Macon Bank, 715 S.W.2d at 349.  The presence of one or more badges of fraud "gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant." Nadler, 2004 WL 1488544, at *2 (citing Macon Bank, 715 S.W.2d at 349).  Courts in Tennessee recognize the following as "badges of fraud":

1.      The transferor is in a precarious financial condition.

2.      The transferor knew there was or soon would be a large money judgment rendered against the transferor.

3.      Inadequate consideration was given for the transfer.

4.      Secrecy or haste existed in carrying out the transfer.

5.      A family or friendship relationship existed between the transferor and the transferee(s).

6.      The transfer included all or substantially all of the transferor's nonexempt property.

7.      The transferor retained a life estate or other interest in the property

35

transferred.

8.     The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.

9.     There is a lack of innocent purpose or use for the transfer.

<u>Stone v. Smile</u>, 2009 WL 4893563, at *5 (Tenn. Ct. App. Dec. 18, 2009) (citing <u>In re Hicks</u>, 176

B.R. 466, 470 (Bankr. W.D. Tenn. 1995)).

    Although both sides have provided evidence on the fraudulent transfer claim, the Court has insufficient information concerning the creation of the Partnership and Trust.  Ms. Asher states that she relied upon the advice of her former attorney, K. Ray Pinkstaff ("Mr. Pinkstaff"), in establishing the Partnership and Trust.  As United States Magistrate Judge H. Bruce Guyton explained, "[e]ssentially, the Defendant [Ms. Asher] submits that she informed Pinkstaff of her goal of protecting her inheritance, and then followed his advice as to how to achieve that goal."  [Order Denying Ms. Asher's Motion to Quash, Doc. 150 at 5].  To learn more about the creation of the Partnership and Trust, Hartford served a subpoena on Mr. Pinkstaff requesting the following information:

> Any and all documents related to the Crowe 2003 Irrevocable Trust Agreement, a copy of which is attached hereto as Exhibit A, and the Limited Partnership Agreement and Asher Investments Limited Partnership, a copy of which is attached hereto as Exhibit B, including, but not limited to any and all file materials, correspondence, drafts, memoranda, notes, e-mails, or any other documents which are related to the creation of either Exhibits A or B attached hereto.

[Hartford's Response in Opposition to Ms. Asher's Motion to Quash, Doc. 146-1 at 1].  On March 2, 2010, Ms. Asher filed a Motion to Quash the Subpoena [Doc. 143].  On April 20, 2010, Judge Guyton denied the Motion to Quash [Doc. 150].  On May 20, 2010, Ms. Asher filed a "Notice of Filing of the Deposition of Attorney K. Ray Pinkstaff" [Doc. 158].  This Notice included deposition testimony of Mr. Pinkstaff, letters from Mr. Pinkstaff to Ms. Asher concerning the creation of the

Partnership, letters from Mr. Pinkstaff to Ms. Asher concerning the creation of the Trust, and other documents.

The communications between Mr. Pinkstaff and Ms. Asher are relevant to deciding whether Ms. Asher created the Partnership and Trust with the "actual intent to hinder, delay, or defraud" Hartford. T.C.A. § 636-3-305(a)(1). As Judge Guyton noted in the Order Denying the Motion to Quash, "[a] fair evaluation of this assertion [the fraudulent transfer issue] requires examining the Defendant's [Ms. Asher's] communications with Pinkstaff regarding the underlying purpose or goal of the transfers at issue." [Order Denying Ms. Asher's Motion to Quash, Doc. 150 at 8]. Although these communications are now part of the record [Doc. 158], neither party has briefed the Court on how this evidence affects the fraudulent transfer claims. In fact, the motions for summary judgment (and the responses, replies, and exhibits) were filed over six months before the recently filed Notice [Doc. 158]. It would therefore be premature for the Court to rule upon the fraudulent transfer claim without considering this information, as briefed by the parties.

While Hartford has standing to assert a claim under the UFTA, it is premature for the Court to decide whether Ms. Asher transferred assets to the Partnership and Trust with the "actual intent to hinder, delay, or defraud" Hartford– that is, with the intent to undermine Hartford's indemnity rights. T.C.A. § 636-3-305(a)(1). Accordingly, the Motions for Summary Judgment on the Fraudulent Transfer Claims [Docs. 84, 94] are **DENIED AS PREMATURE**, with leave for the parties to re-file motions for summary judgment after considering the recently filed exhibits.

### C. The Court Will Not Follow the "Reverse Piercing" Doctrine to Pierce the Corporate Veil of the Partnership

In addition to arguing that Ms. Asher fraudulently transferred assets to the Partnership and Trust, Hartford argues that the Partnership was an "alter ego" of Ms. Asher. [Hartford's Response

to Ms. Asher's Motion for Summary Judgment as to the Fraudulent Transfer Claim, Doc. 113 at 14-15]. Hartford argues that the Court should follow the "reverse piercing" doctrine and treat Ms. Asher and the Partnership as a single entity. [Id.]. Although Hartford did not raise this argument in its initial Memorandum of Law in Support of its Motion for Partial Summary Judgment [Doc. 85], the Court will address the argument. [*See* Doc. 113 at 14-15, Doc. 117 at 9-11].

As a general rule, a corporation "is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors." Nadler, 2004 WL 1488544, at *4 (citing Schlater v. Haynie, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). However, a corporation's separate identity may be disregarded or "pierced" upon showing "that it is a sham or a dummy or where necessary to accomplish justice." Schlater, 833 S.W.2d at 925. However, courts should disregard a corporation's identity "with great caution and not precipitately." Id. In addition, "[t]he burden is on the party seeking to pierce the corporate veil to prove facts sufficient to warrant such an action." Nadler, 2004 WL 1488544, at *4 (citing Schlater, 833 S.W.2d at 925).

A corporation's veil may be pierced under two theories. Under the first– and more common– theory, a "a corporation's veil is pierced for the benefit of creditors of the corporation, allowing them to proceed against the individuals who are the 'trust owners of the entity.'" Reagan v. Connelly, 2000 WL 1661524, at *6 (Tenn. Ct. App. Nov. 6, 2000) (quoting Muroll Gessellschaft M.B.H. v. Tennessee Tape, Inc., 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995)). Under the second theory, a creditor attempts to "reverse pierce" the corporation. Reverse piercing occurs when creditors of the corporation attempt to "pierce the veil of the corporation in order to reach the assets of the individual or individuals in control of the corporation . . ." Nadler, 2004 WL 1488544, at *4 (citing Mfrs. Consolidation Serv., Inc. v. Rodell, 42 S.W.3d 846, 866-67 n.12 (Tenn. Ct. App. 2000)). The Tennessee Court of Appeals has explained the differences between the theories as

follows:

> [W]hereas piercing analysis typically is used to hold individuals liable for the actions of a corporation they control, reverse piercing seeks to hold a corporation accountable for actions of its shareholder.

Mfrs. Consolidation Serv., Inc., 42 S.W.2d at 866-67 n.12.

While Hartford argues that the Court should follow the "reverse piercing" doctrine, it provides no Tennessee case law in support. The Tennessee Supreme Court has only recognized the concept of reverse piercing in the context of parent/subsidiary relationships. *See* Cont'l Bankers Life Ins. Co. of the South v. Bank of Alamo, 578 S.W.2d 625, 632-33 (Tenn. 1979). The Tennessee Court of Appeals has declined to extend the "reverse piercing" doctrine to the corporation/shareholder context. *See* Id. at *4; Reagan, 2000 WL 1661524, at *6. With no Tennessee courts recognizing the doctrine outside the context of a parent/subsidiary relationship, and because this case does not involve a parent-subsidiary relationship, the Court will not follow the "reverse piercing" doctrine. Accordingly, Hartford's Motion for Partial Summary Judgment on its Fraudulent Transfer Claim [Doc. 84] is **DENIED**, to the extent that it seeks to pierce the corporate veil of the Partnership through the "reverse piercing" doctrine. Ms. Asher and the Partnership will be treated as separate entities for purposes of the claims before the Court.

IV. **CONCLUSION**

For the foregoing reasons, Hartford's Motion for Partial Summary Judgment on its Contractual Indemnity Claim [Doc. 81] is **GRANTED**, and Ms. Asher's Motion for Summary Judgment on the Contractual Indemnity Claim [Doc. 96] is **DENIED**. Pursuant to Article III of the 2002 Indemnity Agreement, Ms. Asher and Mr. Crowe are jointly and severally liable for indemnifying Hartford for the losses, costs, and attorneys' fees it sustained in furnishing Bonds to complete CMC's unfinished construction projects, and for settling claims related to those Bonds.

Hartford is **ORDERED** to provide an updated list of all payments it has made in settling claims related to the Bonds and/or to complete CMC's construction projects. This list must be filed with the Court by **SEPTEMBER 24, 2010.**

In addition, while Hartford has standing to assert a claim under the UFTA, it is premature for the Court to decide whether Ms. Asher transferred assets to the Partnership and Trust with the "actual intent to hinder, delay, or defraud" Hartford– that is, with the intent to undermine Hartford's indemnity rights. T.C.A. § 636-3-305(a)(1). Accordingly, the Motions for Summary Judgment on the Fraudulent Transfer Claims [Docs. 84, 94] are **DENIED AS PREMATURE**, with leave for the parties to re-file motions for summary judgment after considering the recently filed exhibits.

Finally, Hartford's Motion for Partial Summary Judgment on its Fraudulent Transfer Claim [Doc. 84] is **DENIED,** to the extent that it seeks to pierce the corporate veil of the Partnership through the "reverse piercing" doctrine. Ms. Asher and the Partnership will be treated as separate entities for purposes of the claims before the Court.

**IT IS SO ORDERED.**

**ENTER:**

       s/ Thomas W. Phillips
     United States District Judge